```
 1            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3
   UNITED STATES OF AMERICA           )
 4                                     )
                                       )
 5                Plaintiff,       )Case No.
              vs.                  )21-00101-CR-W-SRB
 6                                     )
   KENDRA KINGSBURY,                   )Kansas City, Missouri
 7                                     )June 21, 2023
                  Defendant.       )
 8            ...........................
 9         TRANSCRIPT OF SENTENCING HEARING
        BEFORE THE HONORABLE STEPHEN R. BOUGH
10        UNITED STATES DISTRICT COURT JUDGE

11

12     Proceedings recorded by electronic stenography
              Transcript produced by computer
13

14                    APPEARANCES

15  For the Plaintiff:      MR. PATRICK C. EDWARDS
                            United States Attorney's Office
16                          400 East 9th Street
                            Kansas City, Missouri 64106
17
   For the Defendant:      MR. WILLIAM ERMINE
18                          Federal Public Defender's Office
                            1000 Walnut, Suite 600
19                          Kansas City, Missouri 64106

20  Also Appearing:         Mr. Scott Claffee

21

22          Gayle M. Wambolt, RMR, CRR
            U.S. Court Reporter, Room 7552
23       Charles Evans Whittaker Courthouse
             400 East Ninth Street
24       Kansas City, MO 64106 (816) 512-5641

25                         1
```

```
 1                    WEDNESDAY, JUNE 21, 2023

 2            THE COURT:  We are here on the case of United States

 3   of America v. Ms. Kendra Kingsbury, Case No. 21-101.  May I

 4   have appearances by the parties, please?

 5            MR. EDWARDS:  Good afternoon.  Patrick Edwards and

 6   Scott Claffee on behalf of the United States.

 7            MR. ERMINE:  Mark Ermine on behalf of Ms. Kingsbury

 8   who appears in person.  With me at counsel table is my

 9   investigator Ms. Gina Slack.

10            THE COURT:  In reading the government's sentencing

11   memorandum, it appears like you're going to call a witness; is

12   that fair?

13            MR. EDWARDS:  Yes, Your Honor.

14            THE COURT:  Should we try to calculate the

15   guidelines first, then let the government present whatever

16   evidence it needs to and let the defense do whatever it needs

17   to and then go from there?  Is that okay with you?

18            MR. EDWARDS:  I'm certainly fine with that

19   procedure, Your Honor.

20            THE COURT:  Mr. Ermine?

21            MR. ERMINE:  Makes sense to me, Judge.

22            THE COURT:  Mr. Edwards, have you had the

23   opportunity to review the presentence report and make any

24   objections, sir?

25            MR. EDWARDS:  Yes, Your Honor.
```

2

Case 4:21-cr-00101-SRB   Document 48   Filed 07/19/23   Page 2 of 72

```
 1              THE COURT:  No objections?

 2              MR. EDWARDS:  No objections, Your Honor.

 3              THE COURT:  Mr. Ermine, sir, have you had the

 4    opportunity to review the presentence report and make any

 5    objections, sir?

 6              MR. ERMINE:  I have, Your Honor.

 7              THE COURT:  No objections from the defense?

 8              MR. ERMINE:  The only objection that we have that

 9    kind of remains outstanding is we had objected to the

10    educational section of the presentence report.  We were able

11    to obtain verification essentially that Ms. Kingsbury has a

12    master's degree.  We presented that transcript to the

13    probation office as well as to the government.  So we'd ask

14    the court to, I guess, accept that change.  It doesn't impact

15    the guidelines, but it's important to my client.  It's

16    important to the defense.  So we ask the court to make --

17    order that change be made in the final version of that

18    presentence report.

19              THE COURT:  You've got proof she graduated from

20    UMKC?

21              THE PROBATION OFFICER:  Yes, Your Honor.

22              THE COURT:  We'll make that change as requested,

23    Mr. Ermine, to reflect that she graduated from UMKC with her

24    master's degree in criminal justice.

25              Let me ask you some questions, Ms. Kingsbury, ma'am.
```

3

Case 4:21-cr-00101-SRB   Document 48   Filed 07/19/23   Page 3 of 72

| | |
|---|---|
| 1 | Ma'am, have you had the opportunity to review the presentence |
| 2 | report? |
| 3 | THE DEFENDANT: Yes. |
| 4 | THE COURT: And, ma'am, have you had the opportunity |
| 5 | to discuss the presentence report with your attorney? |
| 6 | THE DEFENDANT: Yes. |
| 7 | THE COURT: And other than the master's degree, is |
| 8 | there anything else that you believe to be incorrect or wrong? |
| 9 | THE DEFENDANT: No. |
| 10 | THE COURT: I'll make a finding of a total offense |
| 11 | level of 23, a criminal history category of 1, which results |
| 12 | in a guideline range of 46 to 57 months. |
| 13 | I have read the sentencing memorandums that have |
| 14 | been provided by the parties. I've also read the letters in |
| 15 | support of the defendant that were recently filed by |
| 16 | Mr. Ermine or sent to chambers by Mr. Ermine. |
| 17 | From the United States government, you may call your |
| 18 | witness or make any statement you like. |
| 19 | MR. EDWARDS: Yes, Judge. Before doing that, I'd |
| 20 | like to make a record about some of the discovery issues that |
| 21 | have occurred in this case if that would be okay with the |
| 22 | court. |
| 23 | THE COURT: Sure. |
| 24 | MR. EDWARDS: Your Honor, as the court is aware, |
| 25 | there were 20 documents named in the indictment. Those |

4

documents to this day remain classified. They have been provided for defense review, both by the defendant herself as well as the defense team. They've had the opportunity to review those 20 documents prior to today's hearing and prior to her plea of guilty, which was previously held in this court.

In addition to those 20 documents, there were also three classified declarations.

THE COURT: Mr. Edwards, I'm going to ask you maybe just to speak up a little bit. I'm getting old.

MR. EDWARDS: Why don't I just come to the podium, Judge.

THE COURT: Thank you.

MR. EDWARDS: Your Honor, in addition to the 20 classified documents that are in the indictment, there are also three classified declarations. Those three classified declarations have been provided to the defense attorneys and have been reviewed by the defense attorneys in a classified setting prior to today's sentencing hearing.

THE COURT: Mr. Edwards, I'm sure you're going to say this. The DOJ also sent somebody to my chambers, and in a classified session, I reviewed all those documents and those declarations as well. So there's both of us making a record.

MR. EDWARDS: That's exactly where I was going, Judge. Thank you.

5

1    Those classified declarations remain classified, but
2    they have been reviewed by all the pertinent parties.
3    Your Honor, the evidence that the government would
4    like to present is in the form of testimony by Special Agent
5    Joel Feekes.
6    JOEL FEEKES, being duly sworn by the courtroom deputy,
7    testified:
8    DIRECT EXAMINATION BY MR. EDWARDS:
9    Q    Can you state your name and spell both your first and
10   last name, please.
11   A    My name is Joel Feekes.  It's spelled J-o-e-l.  Feekes
12   is F-e-e-k-e-s.
13   Q    Where are you currently employed?
14   A    I'm currently employed in the FBI Omaha field office at
15   our Sioux City resident agency office.
16   Q    What is your job title?
17   A    Special agent.
18   Q    Prior to joining the FBI, what is it that you did?
19   A    I was a neuroscientist.
20   Q    Let's talk about your current assignment within the FBI.
21   What is your current assignment?
22   A    My current assignment is to investigate what we refer to
23   as Indian country crimes, and I primarily work on Native
24   American reservations.
25   Q    When did you begin that current assignment?

6

Case 4:21-cr-00101-SRB   Document 48   Filed 07/19/23   Page 6 of 72

1    A    In September of 2020.

2    Q    Before September of 2020, can you give the court an idea

3    of your progression through the FBI?

4    A    Yes.  My first field office assignment was in Oklahoma

5    City.  I was assigned to work counterintelligence, which

6    included espionage investigations.  Spent seven years in that

7    field office.  Eventually transferred to the Omaha field

8    office where I was also assigned to work counterintelligence

9    and espionage investigations for six years, and then I

10   volunteered to go to Sioux City.  I continued to work some

11   counterintelligence, including the matter we're here for

12   today, during that time.

13   Q    So for 13 years, you were a special agent working

14   counterintelligence cases?

15   A    Correct.

16   Q    Can you explain to the court what that means to be an

17   FBI special agent working counterintelligence cases?

18   A    Yes.  So counterintelligence falls on our national

19   security side of the house.  One of the goals of

20   counterintelligence is to prevent a theft of classified

21   information from our country, whether it's from the government

22   or military.

23        It can be proprietary, economic related as well, and

24   our goal is to prevent theft from -- it could be an outside

25   entity like a foreign national that would come to America to

7

Case 4:21-cr-00101-SRB   Document 48   Filed 07/19/23   Page 7 of 72

1  spy on us, or it could be an American citizen who maybe has an

2  interest in stealing our information.

3  Q    Can you explain to the court how it is a special agent

4  from Omaha became involved in an investigation out of the

5  Kansas City field office?

6  A    Yes.  So our assistant special agent in charge in the

7  Omaha field office received a call from one of the assistant

8  special agents in charge of the Kansas City FBI field office

9  that they had a matter that they needed to be -- that needed

10  to be investigated.  The reason they were referring it to us

11  is because it involved the defendant who at that time was

12  employed at the FBI Kansas City field office.

13         The defendant had spent some time working on their

14  counterintelligence squad, and, therefore, they knew each

15  other.  And that's typically going to be handled by somebody

16  else if that is the case.

17  Q    Prior to your involvement, had there been a voluntary

18  disclosure by the defendant with regard to classified or

19  possibly classified information found in her home?

20  A    Yes.

21  Q    And that voluntary disclosure, that was made by the

22  defendant to an assistant security officer with the Kansas

23  City field office; is that right?

24  A    That's correct.

25  Q    After that voluntary disclosure, were there searches

8

Case 4:21-cr-00101-SRB   Document 48   Filed 07/19/23   Page 8 of 72

1  conducted of the defendant's home?

2  A    There were.

3  Q    In total, including the voluntary disclosure, were there

4  approximately four searches done of the defendant's home?

5  A    Correct.

6  Q    And so if the search that was conducted by the initial

7  assistant security officer and the defendant counts as one,

8  what was the second search?

9  A    The second search was just a few days after that.  It

10  was conducted by myself and another agent from the FBI Omaha

11  field office along with a few agents from the Kansas City FBI

12  evidence response team.  It largely consisted of a search of

13  the defendant's home office.  At that time we didn't know what

14  kind of information we might be dealing with; so we really

15  focused on her home office.

16  Q    And where was the home office located in the home?

17  A    It was in the lower level of her home.  You had to walk

18  through a bathroom to get to it.

19  Q    And during that first and second search, were both

20  sensitive and classified documents found in both the bathroom

21  and the home office?

22  A    Correct, they were.

23  Q    What about the third search?

24  A    Third search, we decided to search the entire residence

25  because following the second search, the defendant notified

9

1    that she had found some additional documents or digital media

2    that might contain additional information.  So we came back

3    with the FBI Omaha evidence response team, a CART examiner,

4    and we conducted a search of the entire residence, the garage,

5    the car, and a storage unit.

6    Q    And that was a consent search; is that right?

7    A    That's correct.

8    Q    Finally, was there a fourth search of the defendant's

9    work area in the Kansas City FBI field office?

10   A    That's correct.

11   Q    And after that fourth search, did the defendant continue

12   to disclose to you as the case agent and lead investigator,

13   did she continue to find digital media and documents in her

14   home?

15   A    That's correct.  She did find a few additional items.

16   Q    Before the full search of her home and other locations,

17   was the defendant informed that she was not to destroy items

18   that she found in her home?

19   A    That's correct.

20   Q    That would include paper documents as well as digital

21   media?

22   A    Yes.

23   Q    During the third search of the defendant's home, which

24   is the full search of her home as well as other locations, did

25   the FBI find evidence of destroyed digital media as well as

                              10

1    documents?

2    A    That is correct.  We found some CDs and other disks that

3    were cracked or broken and thrown in the trash can.

4    Q    Let's talk a little bit about the results of the four

5    searches.  Were there a total of 386 classified documents

6    found?

7    A    That's correct.

8    Q    And those documents were found not in the first search,

9    not in the second search, but over the course of all of those

10   searches; is that right?

11   A    That's correct.

12   Q    That search also included the 20 defendants -- or 20

13   documents that are included as part of the indictment; is that

14   right?

15   A    That is also correct.

16   Q    Were there approximately 20,000 documents in total found

17   across these four searches?

18   A    Correct.

19   Q    And although not classified, these 20,000 documents,

20   were the majority of them sensitive in nature?

21   A    Yes.

22   Q    And how were they sensitive?

23   A    So a lot of our unclassified documents have additional

24   handling requirements on them; some of which include for

25   official use only or law enforcement sensitive.  Sometimes we

                                    11

1    have unclassified documents that contain confidential human

2    source reporting.  So all three of these types of unclassified

3    documents are still what we would consider somewhat sensitive

4    especially information from confidential human sources.

5    Q    And the vast majority of these documents never should

6    have left the FBI field office or in some instances a secured

7    compartmentalized information facility or SCIF; is that right?

8    A    That's correct.

9    Q    Were the 20,000 documents found in both paper form and

10   electronic form?

11   A    That's correct.

12   Q    Let's talk a little bit about the defendant's employment

13   with the FBI.  Did she begin her employment in 2004?

14   A    Yes.

15   Q    And it essentially concluded in 2018 after her voluntary

16   disclosure; is that correct?

17   A    Yeah.  December of 2017, after her disclosure was -- she

18   was suspended.

19   Q    During the time period that the defendant was employed

20   with the FBI, did she maintain a security clearance?

21   A    She did.

22   Q    Are you aware as to the level of security clearance she

23   maintained?

24   A    I was informed by the FBI Kansas City field office that

25   it was a TS or top-secret SCI clearance.  SCI is sensitive

12

```
 1  compartmented information.
 2  Q    Would the defendant have received training regarding the
 3  dangers and risks of mishandling classified information?
 4  A    Yes.  We have annual trainings on how to handle and mark
 5  and maintain classified information as well as information
 6  security that we have to take every year.
 7  Q    She also would have signed various employment agreements
 8  that would have acknowledged the importance of handling
 9  classified information correctly; is that right?
10  A    That's correct.
11  Q    Those documents also would have discussed the
12  consequences of mishandling classified information; is that
13  right?
14  A    That's correct.
15  Q    You mentioned earlier that Ms. Kingsbury was at one
16  point in time on the national security side of the house.
17  Does the FBI divide their efforts into national security and
18  criminal?
19  A    Yes.  Broadly, we have what we consider criminal squads
20  or national security squads.  Criminal squads focus more on
21  general crime.  There's white collar crime.  National security
22  side, the most obvious ones would be counterintelligence and
23  counterterrorism.
24  Q    And was the defendant ever assigned to a group within
25  the FBI that was on the national security side?
```
13

```
1    A    She was.  She was assigned to a counterintelligence
2    squad from approximately September of 2013 until the fall of
3    2017.
4    Q    Are counterintelligence and counterterrorism the same
5    thing within the FBI?
6    A    No.
7    Q    Can you explain why not?
8    A    So counterterrorism focuses on preventing terroristic
9    threats and acts.  Most familiar one to all of us would be
10   9/11.  Whereas, counterintelligence is trying to protect our
11   national assets, critical infrastructure, secrets, classified
12   information from foreign adversaries.
13   Q    As part of your investigation, did you become aware of
14   the defendant having a computer destroyed at the FBI after her
15   initial disclosure?
16   A    Yes.
17   Q    Can you describe for the court how that occurred?
18   A    Yes.  During the -- or after the defendant's initial
19   disclosure, one of the assistant chief security officers from
20   the FBI Kansas City field office went with the defendant to
21   her residence to retrieve the classified documents that the
22   defendant had disclosed.  At that time the defendant let the
23   assistant chief security officer know about a computer,
24   personal computer that she wanted to dispose of.  Nothing was
25   discussed about to my knowledge what was on the hard drive or
```

14

```
 1    on that computer other than that it was a personal computer.

 2              The assistant chief security officer agreed to

 3    destroy the hard drive at the defendant's request, and they

 4    took the computer back to the Kansas City field office.  I was

 5    told the assistant chief security officer removed the hard

 6    drive, degaussed it, and punched a hole through.

 7    Q    To this day the FBI doesn't have any idea what was on

 8    that computer of the defendant's; is that correct?

 9    A    That's correct.

10    Q    This was prior to the full search of her home and other

11    locations?

12    A    Correct.

13    Q    Had the computer not been destroyed, would you have

14    wanted to search it?

15    A    Yes, absolutely.

16    Q    Why?

17    A    We retrieved every other digital device possible for the

18    reason of we don't know what's on that computer.  It was clear

19    the defendant had taken a lot of FBI documents via electronic

20    means.  So there would be reason to suspect that there could

21    be additional documents or classified information on that

22    computer as well.

23    Q    As part of your investigation, were interviews conducted

24    of the defendant?

25    A    Yes.
                              15
```

1    Q   Did she inform you that she had deleted one of her email

2 accounts prior to one of the interviews?

3    A   That's correct.

4    Q   Had she been asked not to destroy evidence or what could

5 possibly be evidence prior to her destruction of that email

6 account?

7    A   That's correct.

8    Q   Let's talk a little bit about some information that was

9 learned in the initial stages in one of the initial

10 interviews.

11        Did the defendant admit that prior to her

12 disclosure, she had retained and destroyed other classified

13 information in her home?

14    A   That is correct, she did.

15    Q   And in that interview, did she indicate that it was

16 possible she had had in her home and then destroyed top-secret

17 information?

18    A   That's correct.  She informed us that she may have had a

19 top-secret classified document in her home, and to destroy it,

20 she soaked it in water, tore it up into a lot of pieces, and

21 flushed it down the drain.

22    Q   Is that how the FBI endorses destroying classified

23 information?

24    A   No.

25    Q   During the -- one of the interviews, did the defendant

16

```
1    inform you of an incident that had happened at Disneyland in

2    2017 that caused her to destroy another laptop?

3    A    Yes.  She described a trip that her daughter took to

4    Disneyland, and during that time on that trip, she encountered

5    a Russian national.  I think they exchanged Facebook account

6    information, and then after the trip, the defendant described

7    her daughter's laptop as becoming hot or wonky, and was

8    suspicious that somehow it had something to do with this

9    encounter with the Russian national.  So the defendant ordered

10   her son to destroy that laptop with a hammer.

11   Q    As part of the initial interview with the defendant, did

12   she inform the FBI as to why she had made her initial

13   disclosure?

14   A    She did.  She advised us that she thought she was under

15   surveillance.

16   Q    Eventually a second interview was conducted of the

17   defendant; is that right?

18   A    That's correct.

19   Q    In between the first interview and the second interview,

20   did you take steps as an investigator to review the use of the

21   -- the defendant's use of her home phone as well as a personal

22   cellphone?

23   A    We did.

24   Q    And why did you do that?

25   A    We wanted to review any possibility that the defendant
```

17

1  maybe was in contact with case subjects or other derogatory

2  suspicious contacts.  We weren't sure why the defendant took

3  all these classified documents home, and so it's routine in an

4  espionage investigation that we would look into phone records,

5  email records, bank records to see if there's any evidence or

6  reasons as to why she might be taking this information.

7  Q    You mentioned the term "derogatory suspicious contacts."

8  What does that mean in plain English?

9  A    So for us, if we look up a phone number and that phone

10  number is associated with or belongs to a case subject or an

11  individual that has known criminal history, that would be of

12  concern to us.

13  Q    In order to conduct this investigation, did you request

14  and subpoena toll record information for both a home phone and

15  a personal phone that belonged to the defendant?

16  A    That's correct.  We obtained subscriber records and toll

17  records for all of the defendant's phone numbers.

18  Q    How are you able to identify that the home phone

19  corresponded to the defendant?

20  A    For several different reasons.  One was the subscriber

21  records came back and showed that the defendant was the owner

22  of that phone number.  Also we had interviewed the defendant's

23  husband at the time who confirmed that was their home phone

24  number, and looking through the toll records, we also found

25  several incoming, outgoing calls from that home phone number

                                    18

```
 1   to other known members of the defendant's family such as a
 2   mother.
 3   Q    Then how about the toll records for the cellphone, how
 4   did you confirm that that cellphone belonged to the defendant?
 5   A    We also obtained subscriber records for the defendant's
 6   cellphone, which showed that that was her telephone number.
 7   The defendant herself also told us that was her number and
 8   called me on several different occasions from that known
 9   number.
10   Q    Ultimately, did your investigation into these telephone
11   records reveal that the defendant's home phone and personal
12   phone had been in contact with seven different subjects or
13   suspects in FBI counterterrorism investigations?
14   A    That's correct.
15   Q    Is that concerning to you?
16   A    That is very concerning to us.
17   Q    Why?
18   A    The defendant had information in her possession,
19   including classified documents from a counterterrorism case or
20   different cases that were associated with the callers to her
21   home phone number, and in addition to that, any time a known
22   counterterrorism subject or counterterrorism reference would
23   be calling an FBI employee's home phone number, we would be
24   concerned about that.
25   Q    Prior to testifying today, did you review the
                                19
```

```
1   government's sentencing memorandum that was filed in this
2   case?
3   A    I did.
4   Q    In pages 4 and 5 of that sentencing memorandum, there
5   are seven paragraphs that detail in general nature the results
6   of your investigation into the defendant's home phone as well
7   as her personal cellphone.  Do you remember that?
8   A    I do.
9   Q    Are the -- is the information contained in those
10  paragraphs accurate and reflect the results of your
11  investigation?
12  A    Yes, they do.
13  Q    Let's talk a little bit about one of those contacts in
14  particular.  On January 15, 16, and 17 of 2007, did a phone
15  number that's associated to the subject of a counterterrorism
16  investigation call the defendant's home phone number?
17  A    That's correct.
18  Q    And that counterterrorism investigation, was it out of a
19  different FBI field office than Kansas City?
20  A    That's correct.  It was from a different FBI field
21  office.
22  Q    From your review of the toll records, after these
23  contacts on those three days in 2007, did the defendant then
24  conduct a total of four searches in classified FBI databases
25  for the counterterrorism subject's name and telephone number?
```
20

1    A    That's correct.  After the second day, the

2    counterterrorism subject called the defendant's home phone

3    number.  The defendant searched that caller by name and phone

4    number in that secure FBI database.

5    Q    Was the defendant ever assigned to work on this

6    counterterrorism investigation from a different FBI field

7    office?

8    A    No.

9    Q    How did you confirm that she was never assigned or asked

10   to work on that investigation?

11   A    I interviewed the case agent of that case from the other

12   division.

13   Q    We've talked a little bit about it, but as part of your

14   investigation, did you also review the defendant's use of FBI

15   classified and secured databases to conduct searches of

16   counterterrorism suspects or subjects?

17   A    We did.

18   Q    And generally what did your investigation reveal?

19   A    It revealed the defendant had searched numerous,

20   thousands of different counterterrorism-related names or terms

21   or numbers or -- for information.

22   Q    Counterterrorism, not counterintelligence, right?

23   A    That's correct.

24   Q    As part of your second interview of the defendant in

25   September of 2018, did you confront the defendant with the

21

1  results of your investigation into her home phone and her
2  personal cellphone?
3   A    We did.  We provided the defendant with our subscriber
4  records, toll records.  We talked about how we identified that
5  was her home phone number, verified that.  We went over other
6  incoming, outgoing calls from known family members, and then
7  discussed the calls -- what I would refer to as suspicious
8  phone calls from these counterterrorism suspects.
9   Q    Was the defendant able to account for phone numbers
10  associated to her contacting subjects of counterterrorism
11  investigations?
12   A    No.  She denied them.
13   Q    Did you also confront the defendant with the results of
14  your investigation into her searches of classified FBI
15  databases?
16   A    We did.
17   Q    And did she have an explanation as to why she would be
18  searching those individuals?
19   A    The defendant advised that as part of her job, she
20  occasionally does searches that might cross over into other
21  squads.
22   Q    Did you also confront her with the information of the
23  calls to her home phone in 2007 from the other field office?
24   A    We did.
25   Q    In conjunction with her subsequent search of FBI

1 databases for that counterterrorism subject's name and

2 information?

3 A    We did.

4 Q    And did she have an explanation for that phone contact

5 or that search?

6 A    No, she did not.

7 Q    Why would the defendant contacting counterterrorism

8 subjects and searching counterterrorism subjects in cases that

9 she's not assigned to be of concern to the FBI?

10 A    So for several reasons, but the most important probably

11 would be the defendant had in her possession information

12 related to this case.  It would only take a second or two on

13 the phone to tip a counterterrorism subject off to tell them

14 that they're under investigation or to leak sensitive

15 information about that case.  That in turn could lead that

16 counterterrorism subject to change their behavior, destroy

17 evidence, move.  It could jeopardize the entire case.

18 Q    And to be clear, your investigation was unable to reveal

19 why the defendant had any contact with these counterterrorism

20 subjects or why her phones had contact with these

21 counterterrorism subjects; is that right?

22 A    That's correct.

23 Q    You mentioned documents inside of the defendant's home.

24 Were documents related to the investigations into each of

25 these seven counterterrorism subjects found inside of the

23

1  defendant's home?

2  A    Yes.  For some of the calls, callers, the

3  counterterrorism subjects or references, there were documents

4  associated with those cases in the defendant's residence.

5  Q    As of today, does the FBI have any idea why the

6  defendant's phones or phones associated to the defendant would

7  have been in contact with these counterterrorism subjects?

8  A    No.  We cannot explain it.

9  Q    Does the FBI have any idea as to whether or not the

10 defendant shared any of the classified information that she

11 had in her home with anyone, counterterrorism subject or

12 elsewise?

13 A    We do not.

14 Q    Based on your training and experience as an investigator

15 in the counterintelligence area, if the defendant did share

16 classified or other information with a counterterrorism

17 subject or anyone else, is that something that the person who

18 received the information would broadcast or advertise?

19 A    No.  It would be not in their best interest to share

20 that they were tipped off if they were trying to show that

21 they're innocent or to avoid prosecution or destroy evidence.

22 It wouldn't be in their best interest to tell anyone about

23 that.  We did have the opportunity to interview some of these

24 callers if they were still alive or in the country, and they

25 denied knowing anything about it.

                                24

1          MR. EDWARDS:  Your Honor, at this time I have no

2     further questions.

3          THE COURT:  Mr. Ermine, I've got a few questions of

4     this agent, and if you think it's appropriate, I might ask a

5     few questions.  That way you can do your follow-up on all

6     those matters.  Is that fair?

7          MR. ERMINE:  That's fine.

8     EXAMINATION BY THE COURT:

9     Q    Sir, I'm going to ask you just a couple questions just

10    to make sure I'm fully on board.

11    A    Uh-huh.

12    Q    In particular, on page 5 of the government's sentencing

13    memorandum, paragraph 7 that you've testified about on the

14    January 15th, 16th, 17th, 2007, phone calls from the home

15    phone number, I'm just trying to nail down the timing of it

16    because if I understand it right, there were some initial

17    phone calls and then the search -- four searches of FBI

18    databases and then an additional phone call; is that fair?

19    A    That's correct, Your Honor.  So the first call came on

20    day one.  Then the next day there was an additional call.

21    Some -- a few hours after that, the defendant searched that

22    caller's name and phone number by name and number in a secure

23    FBI database, and then the day after that, there was an

24    additional call from that same person back to the defendant's

25    home phone number.

                              25

1    Q    At some point during one of those interviews with the

2    defendant, she denied having the number that you believe to be

3    her home phone number; is that fair?

4    A    That's correct, Your Honor.

5    Q    Did she ever change her testimony on that?

6    A    No, sir.

7    Q    We've talked about her home phone number and her

8    personal cellphone number.  Did she have a work cellphone?

9    A    That's correct.

10   Q    Was there any searches on that?

11   A    There were.

12   Q    Was there any information that was discovered on that?

13   A    The work cellphone was harder to -- we were able to

14   review all the records.  However, nothing as suspicious as

15   what we found on the home phone and personal cellphone were

16   revealed.

17   Q    And I guess that would make sense if potentially

18   somebody was doing something nefarious, you wouldn't do it on

19   your work-supplied cellphone number; you would do it on

20   something else?

21   A    Correct.  And it's harder to identify if you're using

22   your work cellphone for work.  That would make sense.  We'd

23   expect to see maybe some more work-related calls but still not

24   from counterterrorism-related subjects or references.

25   Q    Is there any part of the defendant's job as an FBI

                              26

1   analyst that would require her to call subject -- people who's

2   subject to these investigations?

3   A    No.  That would be extremely rare.  It's typically

4   handled by special agents.

5   Q    And if there was any time that she was supposed to call

6   someone who's the subject of an investigation, would there

7   have been documentation of how that had been played out?

8   A    Absolutely.  And the case agent would have been well

9   aware of that and would have had to request the defendant to

10  do something like that.

11  Q    Your collection of the phone records seem to have gone

12  back even before her employment at the FBI going all the way

13  back to 2000; is that fair?

14  A    That's correct.

15  Q    And there's at least one call that you were able to

16  identify in the sentencing memorandum talks about it being 38

17  minutes long where the FBI believes there was a suspicious

18  call to someone who was the subject of a counterterrorism

19  investigation?

20  A    That's correct.

21  Q    Were you able to learn anything more about that call?

22  And was that call prior to her employment?

23  A    Correct.  We weren't able to learn anything additional,

24  but it was prior to her employment, if I recall.

25  Q    Did you ask her about it?

27

```
 1   A    I believe we covered all of the suspicious phone calls

 2  with the defendant.

 3   Q    Did she deny doing anything nefarious?

 4   A    She did.  She denied doing anything.

 5   Q    Did she deny the phone calls or did she deny -- we're

 6  all trying to figure out what was said on that phone call.

 7  Lord knows we're -- it's not out there in the digital space

 8  for us to listen to.

 9   A    Correct.

10   Q    But she said she didn't make the calls or she didn't

11  remember the calls or --

12   A    Yeah.  She denied making the calls or receiving the

13  calls or knowing anything about the calls.

14   Q    At some point she stopped having conversations with you;

15  is that fair?

16   A    That's correct, Your Honor.

17   Q    And at some point that was after you got all these phone

18  records; is that fair?

19   A    Correct.

20   Q    But you've attempted to talk to her to try to pin this

21  down for your own counterterrorism investigations?

22   A    Correct, yeah.  We were able to interview the defendant

23  about all of these phone calls and everything else that we

24  needed to address with the defendant.  It was sometime after

25  that where we stopped to have to communicate with the
```

28

1   defendant as much.

2   Q   So you asked her all the questions you wanted to about

3   these phone calls, but she just denied them?

4   A   That's correct, Your Honor.

5         THE COURT:  Mr. Ermine, I don't have any more

6   questions.

7   CROSS-EXAMINATION BY MR. ERMINE:

8   Q   Special Agent Feekes, you testified that this all

9   started due to a voluntary disclosure by Ms. Kingsbury,

10   correct?

11   A   That's correct.

12   Q   That took place in December of 2017, right?

13   A   Correct.

14   Q   And after that, you testified about four searches that

15   you all conducted, correct?

16   A   Correct.

17   Q   And each of those searches -- well, in particular the

18   first three were of Ms. Kingsbury's personal property,

19   correct?

20   A   That's correct.

21   Q   She consented to those searches, didn't she?

22   A   Yes, she did.

23   Q   And I think you said that the fourth search took place

24   at her work area in the FBI field office, right?

25   A   That's correct.

29

1   Q    So she didn't really have to consent to that; you guys

2   had access to that area already, correct?

3   A    That is true, although I do believe she consented to

4   that also.

5   Q    Okay.  And I think you even said that with regard to the

6   third search of her -- you described the third search as being

7   of her entire residence, right?

8   A    That's correct.

9   Q    And you said that she actually called you guys in to

10  come do that search because she had found some additional

11  documents; is that correct?

12  A    That's true.

13  Q    I think you mentioned in that same connection that she

14  had kept you up to date personally.  When she found additional

15  documents, she disclosed that she had found those documents,

16  right?

17  A    That's correct.

18  Q    So you testified that during the searches, you found

19  evidence that some media had been destroyed; is that right?

20  A    That is true.

21  Q    So were these like CDs, things on CD that you could see

22  like a shattered CD in a trashcan or something like that?

23  A    That's correct.

24  Q    And my recollection is that some of those CDs, maybe you

25  were able to -- you or your other agents were able to look at

                                30

1    them or you spoke to Ms. Kingsbury about them and she told you
2    or you were able to at least see the labeling on them that
3    they were pictures or a retirement party or things like that;
4    is that correct?
5    A    Yes.
6    Q    Or at least some of the documents or some of the media,
7    correct?
8    A    Correct.  Some of the disks had what -- or something
9    written on them that indicated it was from the FBI, and we did
10   ask the defendant about them.  And she indicated that some of
11   them contained, like you mentioned, pictures maybe from a
12   retirement party or something like that.
13   Q    And I think you probably learned through the course of
14   your investigation that particularly during this time,
15   Ms. Kingsbury was engaged in kind of amateur photography so
16   photography was kind of one of her things, correct?
17   A    Correct.
18   Q    So it made -- it at least made sense that she would have
19   quite a few photographs on various media, right?
20   A    True.
21   Q    And so you guys were also able to seize or take
22   possession of all of her electronic devices and conduct
23   searches of those devices by way of her consent, right?
24   A    That's correct.
25   Q    And did you find evidence supporting her photography

                              31

1    hobby as you searched through those devices?

2     A    I believe we did.  My primary focus was on finding

3    documents.

4     Q    Right.

5     A    But, yes.

6     Q    So you had mentioned that, of course, we're dealing

7    with, what is it, 386 classified documents; is that right?

8     A    That's correct.

9     Q    And then there's approximately 20,000 other documents

10   that you characterized as sensitive, correct?

11    A    Correct.

12    Q    So the sensitive documents, those would vary in content,

13   right?  They would involve things like maybe even emails or

14   PowerPoint presentations, things of that kind of category?

15    A    Yeah.  There were, I guess a variety of FBI-related

16   documents, whether it was an official document.  We have

17   different terms for these like an electronic communication or

18   an FD-302.  But there were also FBI-related emails and I

19   believe some PowerPoints as well.

20    Q    Okay.  PowerPoints like training presentations, things

21   of that sort?

22    A    Correct.

23    Q    Now, you mentioned that part of the investigation it

24   sounds like quite early on revealed that there was a computer

25   that had been destroyed, correct?
                                32

```
 1   A    That's correct.

 2   Q    I'm talking here about the computer that was destroyed

 3   at the FBI.

 4   A    Yes.

 5   Q    So this computer you mentioned was turned over by

 6   Ms. Kingsbury to a person with the FBI, right?

 7   A    That's correct.

 8   Q    And the person that she gave the computer to was -- did

 9   you say it was an assistant chief security officer?

10   A    Yes, that's correct.

11   Q    And then that person -- I think it's a he --

12   A    Correct.

13   Q    He did the FBI special computer wiping thing of that

14   computer and so that's why you don't know what's on it,

15   correct?

16   A    Correct.

17   Q    But she had given that computer over to the FBI's

18   security officer for purposes of destroying it, right?

19   A    That is correct.

20   Q    And then I guess continuing on with the discussion about

21   things that were destroyed or deleted, you testified that you

22   also discovered that she had deleted an email account I guess

23   kind of during the timeline where you all are conducting your

24   interviews of her?

25   A    That's correct.  We talked to the defendant prior to one
```

1    of our interviews and had requested that she not delete or

2    destroy anything.

3    Q    And I guess, just to kind of set the stage for

4    discussion of these interviews, these are interviews that

5    she's giving to you voluntarily, correct?

6    A    That's correct.

7    Q    And I think you testified that she volunteered the

8    information about having deleted the emails, correct?

9    A    That's correct.

10   Q    She admitted to you that -- well, for example, you

11   testified that she told you that there was a top-secret

12   document that -- or she thought there was a top-secret

13   document that she had destroyed that was in her home, correct?

14   A    That's correct.

15   Q    So that's information that she volunteered to you about

16   the top-secret document, right?

17   A    True.

18   Q    And as part of this investigation, you didn't locate any

19   top-secret documents in her home, correct?

20   A    That's correct.

21   Q    Kind of going back to what started all of this with

22   regard to her voluntary disclosure in December of 2017, she

23   told you about these incidents, the one at Disneyland, for

24   example, that you testified to, and that's kind of her

25   reasoning for the self-disclosure, correct?

                                  34

```
 1   A    Yeah.  She disclosed that and the fact that she thought
 2   she was under surveillance.
 3   Q    Did she tell you who she thought she was under
 4   surveillance from?
 5   A    She alluded to that she thought it was the FBI.
 6   Q    She wasn't under surveillance from the FBI, though, as
 7   far as you know, was she?  Not at that time?
 8   A    Sorry.  Would you repeat the question?
 9   Q    She wasn't under surveillance from the FBI prior to
10   December of 2017, though, was she, as far as you know?
11   A    Yeah.  As far as I know, she was never under any
12   surveillance, and I was told the -- by the Kansas City office
13   verified that also.  They would have no reason to surveil her.
14   Q    All right.  They didn't know anything was up until she
15   self-disclosed, right?
16   A    Correct.
17   Q    So then after -- I think the judge was asking you a
18   little bit about this timeline.  After the disclosure, you
19   conduct was it three voluntary interviews with her; is that
20   right?
21   A    That's correct.
22   Q    And then she continued to stay in contact with you
23   disclosing additional documents.  Of course, this is all
24   happening at the same time, right?
25   A    True.
```

35

```
1   Q    So these things are overlapping?

2   A    Yes.

3   Q    And then thereafter did she continue to have contact

4   with you or I guess, again, kind of overlapping this

5   timeframe, was she having contact with you asking about when

6   she might be able to go back to work?

7   A    She did.

8   Q    Okay.  So you testified that, I guess, fairly shortly

9   after the self-disclosure in December of 2017, she was

10  suspended from the FBI?

11  A    Correct.

12  Q    And then in the following months, she continued to reach

13  out to you to see about when she was going to be unsuspended,

14  right?

15  A    That's true.

16  Q    Do you remember how long her request to you about when

17  she would be unsuspended went on?

18  A    For a while.  I don't remember the exact date, but it

19  was several months.

20  Q    I don't remember either, and I'm not trying to trick

21  you.  But it was like six months?  I mean, it was a fairly

22  long period of time, correct?

23  A    Yes.  That sounds right.

24  Q    So then you guys -- the FBI set out about doing this, I

25  guess, additional investigation regarding the phones and the
                              36
```

1  bank records and all sorts of that trying to figure out what's

2  going on, right?

3   A    Correct.

4   Q    And I think we glided over this in the government's

5  questioning, but you did subpoena -- you requested and

6  subpoenaed bank records for Ms. Kingsbury, right?

7   A    Correct.

8   Q    And since you didn't testify about it on direct, I

9  imagine that you didn't really find anything of investigative

10  note in reviewing the bank records?

11   A    That's correct.  We didn't see any unexplained income,

12  anything.

13   Q    Okay.  So then let's talk about the phone calls.  So

14  you, I think, mentioned this.  You testified that there was

15  these different sections of the FBI that are kind of --

16  compartmentalized may be too strong of a word but kind of

17  focused on different particular areas, correct?

18   A    Correct.

19   Q    So like counterterrorism, counterintelligence, criminal,

20  different sections, right?

21   A    That's correct.

22   Q    Has it been your experience that from time to time there

23  is overlap between these -- the investigations that might be

24  going on in those different divisions?

25   A    There can be occasionally.

37

```
 1   Q   Okay.  So they're not, you know, strictly walled off
 2   from each other, I guess, is the point; is that right?
 3   A   That's correct.  There is usually a need to know, but
 4   they can spill over occasionally.
 5   Q   Yeah.  So I guess that gets to the question about the --
 6   some of the questions about the search process that an FBI
 7   analyst might run on these FBI databases that you've talked
 8   about.
 9           So please correct me if I'm wrong.  Someone wouldn't
10   say I'm a counterterrorism analyst; therefore, I'm searching
11   the counterterrorism analyst database?  Instead such a person
12   has access to all sorts of things?
13   A   The entire database.
14   Q   Okay.
15   A   Correct.
16   Q   And I guess the idea behind that is you don't want
17   people to kind of have blinders on when they're doing an
18   investigation because it could go wherever investigations go,
19   right?
20   A   There's potential for that.
21   Q   Okay.  And each of the searches that a person, an
22   analyst, would run on these -- in these FBI databases, those
23   would be logged, correct?
24   A   Sorry.  Repeat the question, please.
25   Q   Would the searches that a person runs in the FBI
                              38
```

1    database be logged?

2    A    Yes, that's correct.

3    Q    And that's how you were able to figure out what kind of

4    searches she was running?

5    A    Correct.

6    Q    Those searches are logged under the user's information,

7    right?

8    A    Yeah.  The user has a password; so there's no one else

9    that can search under their name, so to speak.

10   Q    So kind of like the judge was asking you about, it

11   wouldn't maybe be particularly wise for a person to use their

12   work phone to engage in some of these phone calls that we're

13   talking about?

14   A    Correct.

15   Q    Because they would be found on a person's work phone,

16   right?

17   A    That's correct.

18   Q    But the searches on the database are similarly logged

19   under that person's name and information with a password,

20   right?

21   A    Correct.

22   Q    I assume there's training about not sharing passwords

23   and that sort of thing?

24   A    Yes.

25   Q    So with respect to kind of at a more narrow level, these

                                    39

1  phone calls that you've testified about, it sounds like you

2  were -- I think you testified and the government's sentencing

3  memo says that you were never able to really pinpoint exactly

4  what was going on with regard to the phone calls, right?

5   A    That's correct.

6   Q    Yeah.  You mentioned near the end of your testimony that

7  you made contact with the people on the other end of the phone

8  calls and attempted to interview them to the extent you were

9  able to do so, correct?

10  A    Correct.

11  Q    And I guess expectedly they didn't give you anything of

12  note to further your investigation of Ms. Kingsbury, right?

13  A    That's true.

14  Q    Now, those people, I think you mentioned at least some

15 of them, they were themselves under investigation at the time

16 that the phone calls took place, right?

17  A    Some of them were at the time of the phone calls.  There

18 was some that the phone calls were made after they were under

19 investigation.

20  Q    So these phone calls, you don't know the content of

21 them, right?

22  A    Correct.  We don't know what they said on the phone

23 calls.

24  Q    And some of them, and we've kind of highlighted here the

25 phone call from paragraph 7 from January of 2007, right?

                              40

```
 1   A    Correct.

 2   Q    So that took place many years before you were conducting

 3   your investigation, right?

 4   A    That's correct.

 5   Q    But it took place -- according to this, the other end of

 6   the phone call was subject of a counterterrorism investigation

 7   at that time?

 8   A    Correct.

 9   Q    And I don't think that was your investigation; so I

10   won't go into a lot of detail about that.  That's not really

11   why we're here.

12          But would it be typical as the FBI has a

13   counterterrorism subject under investigation to be monitoring

14   that subject's activities?

15   A    Yes.  So that field office would have been monitoring

16   that subject's activities.

17   Q    So that would -- could potentially -- of course, we

18   don't know the specifics here -- that could potentially

19   involve monitoring that person's phone calls back, you know,

20   contemporaneously with when they were taking place in January

21   of 2007, right?

22   A    Correct.  Although that's how they did obtain subscriber

23   and toll records for that subject, but it's a little different

24   than -- we have a procedure in criminal cases that's more live

25   time.  There is one for a national security site also.  That
```

41

```
 1    is a lot more invasive.  It wasn't in place.  So this other
 2    field office, when they obtained their phone records, they're
 3    usually historical.
 4    Q    So you're saying that it's likely that at the time they
 5    would not have been monitoring each and every phone call that
 6    this subject was making?  Is that what you're saying?
 7    A    Yeah.  And more likely when they obtained their toll
 8    records for their case subject, they would have got a batch
 9    over X amount of years, and then they'd go back and look at
10    all those numbers.  So most likely they wouldn't have
11    immediately been aware of the fact that their subject was in
12    contact with the defendant's home phone number.
13    Q    Isn't it true, though, that as part of an investigation
14    like that, it would be important for the investigators to
15    develop some understanding of the network of the subject?
16    A    Correct.
17    Q    I mean, they'd want to know who the subject is
18    associated with, right?
19    A    Yes.
20    Q    Among many other things, that would be an important
21    thing for them to be aware of, right?
22    A    Correct.
23    Q    So that would involve things like maybe even monitoring
24    who the subject is meeting up with on a given day, right?
25    A    If possible.
```
42

1    Q    Right.  Okay.  And, of course, there's no evidence here

2    that any of these subjects that we're talking about met with

3    Ms. Kingsbury, right?

4    A    Not to our knowledge.

5    Q    Okay.  And then I think the last thing maybe the judge

6    asked you about was the call from 2000.  This is the call

7    dating from four years -- approximately four years before she

8    joined the FBI, correct?

9    A    Correct.

10   Q    Did you learn through your investigation that she was

11   employed in a different law enforcement capacity at that time

12   with a different agency?

13   A    Yes, that's correct.

14          MR. ERMINE:  Thank you, Agent Feekes.  Thank you,

15   Judge.

16          MR. EDWARDS:  No redirect, Your Honor.

17          THE COURT:  Thank you, sir.  You may step down.

18          Any additional witnesses by the United States

19   government?

20          MR. EDWARDS:  No, Your Honor.

21          THE COURT:  Any witnesses by the defense?

22          MR. ERMINE:  No witnesses, Judge.

23          As you alluded to earlier, we presented to the court

24   three letters.  We just ask the court to make those part of

25   the record as Defense Exhibit No. 1 for purposes of this

                                43

1  hearing, but I previously emailed those to the court and the

2  government has seen them as well.

3         THE COURT:  Any objection to making those part of

4  the record?

5         MR. EDWARDS:  No, Your Honor.

6         THE COURT:  Those are admitted as Exhibit No. 1.

7         As I've alluded to, I've read the sentencing

8  memorandums.

9         Mr. Edwards, what is the recommendation for

10  sentencing by the United States government?

11         MR. EDWARDS:  Your Honor, the government begins by

12  acknowledging that the court needs to take into consideration

13  the sentencing guidelines in this case, but in addition to the

14  sentencing guidelines, the court needs to consider the 3553(a)

15  factors.  Both the guidelines and the 3553(a) factors are

16  discussed in the government's sentencing memorandum as the

17  court has already referenced.  I don't want to repeat all of

18  those arguments, but I'm going to highlight some for the court

19  the government feels are particularly important.

20         I'll begin by acknowledging what's in the sentencing

21  memorandum, which is our recommendation for a sentence in this

22  case is 57 months followed by three years of supervised

23  release.  That is the high end of the guidelines.

24         Judge, this is a defendant who knowingly and

25  willfully retained in her home 386 classified documents, 20 of

44

which were selected for the indictment and contain national
defense information.  I'm not going to talk about the contents
of those documents.  Those documents speak for themselves.

        The defendant and the court have also had the
opportunity to review the declarations that go along with
those 20 indictment documents.  Again, I'm not going to talk
about those declarations because they speak for themselves.

        What I can say is that the 20 indictment documents
combined with the three declarations are compelling.  It's
impossible to review them and not understand the gravity of
the situation that the defendant finds herself in due to her
own actions and the choices that she made.

        This defendant for 12 and a half years collected and
maintained thousands of documents that she then kept in an
unsecured space in her home, her home office, a bathroom in
her basement that was connected to her home office, and other
locations.  Anyone who was in her home could have stumbled
upon those documents.  And, of course, 20,000 documents, only
386 of which were classified, but all of which were sensitive.
And you heard Special Agent Feekes' explanation as to why it's
not just the exposure or potential exposure of these 386
documents that's significant; it's the potential exposure of
all of these documents.

        Judge, we'll never know what was on the two laptops
she destroyed.  We'll never know what documents she kept but

                                45

that the FBI wasn't able to find because she destroyed or got rid of in some form or fashion, not in the approved FBI fashion, but in some form or fashion that she decided was the correct way to do it on her own.

There's no way to know the full extent of the information that she maintained in her home. There's no way to know the full extent of what someone else may have discovered because of the information that was contained in her home, and there's no way to know what she may have done with that information or what others may have done with that information.

As Special Agent Feekes testified to, this defendant's phone numbers were in contact with phone numbers associated to subjects of CT investigations both in Kansas City and in another field office. The defendant conducted thousands of searches in classified FBI systems with regard to CT investigations that she was not assigned to and that she did not investigate at times when she was not on the counterintelligence squad. Counterintelligence is not counterterrorism.

All of these calls and all of these searches occurred during the time that the defendant was in possession of hundreds, if not thousands, of classified documents and most definitely thousands of sensitive documents. Some of them, which, of course, contain national defense information

46

1  classified at the secret level and by the defendant's own

2  admission, some of which may have been top secret.

3          Of course, it's concerning that she was in

4  possession of this information and that she was in contact

5  with the subjects of these CT investigations, but the question

6  that remains is what was the defendant doing?  And there's no

7  way to answer that question.  We don't know and we will likely

8  never know.  But whatever the explanation is, there is no

9  explanation that can justify her actions, her retention of

10  these documents, and her keeping them inside of her home.

11          This defendant was entrusted with the security

12  clearance and access to national defense information.  She was

13  entrusted with access to classified information that if

14  disclosed could endanger the national security of the United

15  States and the safety of its citizens.

16          Rather than honor the trust that was placed in her,

17  the defendant violated that trust for 12 and a half years,

18  and, yes, she did voluntary disclose her possession of these

19  documents but only because she felt she was under

20  surveillance.  And prior to her full disclosure, she destroyed

21  a laptop.  She destroyed items in her home prior to the full

22  search of her home, and she only did this because she believed

23  she was under surveillance.

24          As I said, we will never know if the information the

25  defendant retained was discovered by someone, shared with

                                    47

someone, or used against the interest of the United States. There is no way to know when the documents were obtained by the defendant, how long they were retained in her home, or who may have taken some or all the information contained in the documents and communicated that to someone else. And as Special Agent Feekes testified to, part of the reason we will never know is because enemies of the United States would never tell us how they came into possession of that information.

Judge, what the government is asking is that this court take into consideration all of the 3553(a) factors, the evidence presented today here from Special Agent Feekes, the information in the PSR, and come to an appropriate solution as to what the sentence in this case should be.

This defendant's actions were intentional. She violated the trust that was placed in her by the United States government and by the people of the United States, trust that was placed in her to handle this classified information in an appropriate manner.

The defendant's criminal retention of the information in her home only came to light after the fact that she was under surveillance, and that demonstrates that her primary concern was for herself rather than for the possible damage that her actions could have had to the security of the United States. The defendant had a duty and an obligation to protect classified information, and instead she took actions

48

1    that exposed national defense information to discovery,

2    disclosure, and possible communication.

3            Questions remain as to what the defendant was doing

4    with the information, but the contact between her phones and

5    phone numbers associated to counterterrorism subjects in

6    conjunction with her search of FBI databases for information

7    in those same counterterrorism subjects highlights not just

8    the defendant's recklessness but the fact that she was acting

9    contrary to the interests of the United States.

10           Your Honor, based on the guidelines, the evidence,

11   and the 3553(a) factors, it's the government's assertion that

12   57 months with three years of supervised release is the

13   correct sentence in this case.

14           THE COURT:  Thank you, Mr. Edwards.

15           Mr. Ermine.

16           MR. ERMINE:  Your Honor, we in our sentencing memo

17   are asking the court to credit Ms. Kingsbury for her voluntary

18   self-disclosure.  The government is attempting to undermine

19   her disclosure by pointing to testimony that's really lacking

20   in conclusion.

21           They're asking the court to essentially sentence

22   Ms. Kingsbury based on speculation about what her activities

23   might have been rather than what the evidence actually shows

24   took place.  We think that it is extremely important not only

25   that she self-disclosed, we think that the government's

                                  49

attempt to kind of suggest that that is mere self-interest in terms of self-disclosure because she said that she believed she was under surveillance when she wasn't actually under surveillance is undermined by pretty much everything that took place thereafter.

She voluntarily consented to multiple searches. She consented to multiple searches of her home, one of the most personal places a person can have. She gave away all of her electronic devices with all of the photographs that she had taken over the years as part of her photography hobby and side business. She consented to multiple interviews with investigators. She told them things that but for her telling them, they would not have known.

She told Agent Feekes, as he testified to, about having destroyed a top-secret document that she found in her house. That's not something she would have had to tell him.

If we're talking here about self-interests, she would have surely made a much more self-interested statement. Instead she -- not only did she voluntarily disclose the presence of the classified documents, she voluntarily disclosed even things that the investigators would never have discovered on their own.

She gave them access to very personal information, and she did that not once, not twice, three times. Three times she submitted interviews. Four times she submitted to

50

1   searches over an extended period of time as they conducted

2   their investigation.

3         The government is presumably placing a lot of

4   emphasis on the phone calls, and, you know, we have a problem,

5   I guess, both factually and legally with the courts giving

6   those phone calls a lot of weight.  No one really knows what

7   the evidence means.  It's not even really clear exactly what

8   the evidence is.  There's phone calls that take place for the

9   most part fairly remotely back in the mid 2000s.  Nobody knows

10   the content of the phone calls.

11         There's nothing that investigators have been able to

12   turn up in what's surely an extremely thorough investigation

13   of Ms. Kingsbury, her background that leads them to draw a

14   firm conclusion about what to make of the phone calls.  So in

15   the absence of drawing such a firm conclusion, they're asking

16   the court to draw whatever inference they're asking the court

17   to draw.  It's kinds of unclear exactly what they're

18   suggesting.

19         THE COURT:  I mean, I think what they're suggesting

20   is something nefarious.

21         MR. ERMINE:  Oh, yeah, certainly.  But what is it?

22         THE COURT:  Let me push back so you can address my

23   concerns.

24         MR. ERMINE:  Yes, sir.

25         THE COURT:  So some were in the mid 2000s; some were

1   paragraph 6, December 20th, 2016 through January 19, 2017;

2   paragraph 4, 22nd call in 2018; paragraph 1, April 2nd of

3   2016; paragraph 2, phone call in 2012 to the subject of a

4   counterterrorism investigation that was closed in 2006 after a

5   sentencing hearing.  So, you know, some in the mid 2000s, some

6   closer to present.

7        What I understand, and feel free to correct me if

8   I'm wrong, was that your client denied that was her phone --

9   home phone number placing those calls, and she denied knowing

10  existence of any of those calls.  So I've got on one side the

11  federal government suggesting something nefarious, and I've

12  got on the other side, your client denying, not my phone, I

13  don't know what you're talking about, have no idea.

14       So I'm left with two dramatically different

15  approaches, and if you and Mr. Edwards wants to come back up

16  and help me resolve these, the separation is night and day.

17       MR. ERMINE:  I think you've accurately summarized

18  the positions of the parties, Judge.  I mean, the difference

19  is night and day.

20       For our part, we believe that her voluntary

21  self-disclosure, essentially turning herself into the FBI, her

22  employer when she's worked for them for 12 and a half years.

23  So she knows the sorts of investigations that the FBI can

24  conduct, and surely she knows that by opening up her home and

25  submitting to multiple interviews with the FBI that she's

                              52

opening herself up to an investigation.  In fact, that
investigation took place.

So from our perspective, we believe it's extremely
important for the court to consider that disclosure.  You
know, I guess to say it somewhat rhetorically, why would a
person open themselves up to that when there's no pressing
need to do so?

She essentially turned herself in.  She let them
come in and get all the documents.  She told them about other
documents that they were never going to find.  She gave a
computer over to the FBI itself for destruction.

So, I mean, I'm not a blind man.  I see the -- I see
why the government is trying to suggest to the court the
inference that you should make.  I'm suggesting on the other
hand that a lot of the actual concrete facts that we have, not
on the side of speculation, but the concrete facts of somebody
voluntarily self-disclosing and opening themselves up to this
sort of investigation tend to indicate that maybe things
aren't quite as nefarious as what the government would have
the court believe.

THE COURT:  Was it her home phone number?

MR. ERMINE:  Well, I wasn't there, Judge.  I can't
answer those sorts of questions.  I mean, I think that that is
an extremely important thing, but it's the government's burden
to prove these things, right?  The government has the ability

53

1  to conduct these investigations.  They conduct their own

2  investigations.

3          You heard about a part of it here today and seen

4  more of it in the presentence report.  And so, you know, there

5  are, I guess, open questions.  I guess as a fundamental

6  problem on the defense side, we think that open questions

7  should be resolved in favor of the defendant because, again,

8  the burden to kind of resolve those questions and to present

9  reliable information falls to the government to convince you,

10 the judge, to consider whatever inferences they want you to

11 draw.  So that's --

12         THE COURT:  So you think an important determination

13 that I'm supposed to make under the preponderance of the

14 evidence standard is whose home phone number and whose private

15 cellphone number that is?

16         MR. ERMINE:  I don't know that I would stick my neck

17 out quite that far, Judge.  I think that it's for you to

18 decide what weight you give to this -- I guess these

19 breadcrumbs, right?  They want you -- the government wants you

20 to see these breadcrumbs and follow them down a certain path.

21         I guess you could choose to do that or not do it

22 depending on how you see things.  I'm merely suggesting that

23 the weight you give it should be minimal because on the other

24 side of the scale, we have the self-disclosure.  We have the

25 thorough investigation, and we don't have anything, you know,

                              54

```
 1    that's so concrete that would raise that in weight,

 2    particularly --

 3            THE COURT:  Does your client agree that she told the

 4    FBI that the reason she self-disclosed was because her

 5    daughter had met somebody, a Russian individual, at

 6    Disneyland, and they connected and then the computer started

 7    acting wonky, and she had her son destroy it with a hammer,

 8    and then she thought she was being followed by the FBI; that

 9    that was the reason she self-disclosed?  Is that a fair

10    recitation of your client's position?

11            MR. ERMINE:  I think that that is -- well, that's

12    certainly what was said in the interview with the agents.  You

13    know, part of the reason why I asked Agent Feekes some of the

14    questions I asked particularly with regard to his continued

15    communication with Ms. Kingsbury after the disclosure I think

16    are important as the court is considering her mindset.

17            And so I mentioned in our sentencing memo kind of

18    the parallel chronology of this activity that's going on, and

19    her personal circumstances both are -- you know, her mental

20    health, her physical health, these things are being

21    drastically impacted by the things I mentioned in my

22    sentencing memo.

23            So kind of along those lines, I think it's, as the

24    court is considering her mindset at the time of the

25    disclosure, I think it's noteworthy that even after the
                                 55
```

disclosure, after the investigation kicks off, after the
multiple searches and interviews, that she continues to
contact Agent Feekes to see when she's going to be unsuspended
and return to working at the FBI. Not only shortly
thereafter, but as he testified to, months thereafter she's
continuing to inquire.

So I think, as the court is considering her mindset,
you know, is that a situation that makes a lot of sense, or is
it indicative that there's something else going on here that
she has been drastically impacted by her work over the years
with the FBI and particularly by her personal circumstances
and personal hardships that she's gone through over the years
that have led her to have this sort of thought process that
she's had.

And I think too, you know, we kind of focused on
this idea that over the course of her career with the FBI, you
know, I guess if they want it to be that she's, you know, just
constantly taking documents out of the FBI. But, I mean, she
was a financial -- an intelligence analyst for the FBI. She
helped them to solve cases and to better the community.

You know, she was transferred around from section to
section within the FBI. I think she's going to address the
court and talk about how she always tried to do her best to
further the FBI's goals and to further the investigations that
she was assisting on.

56

1    There's some indication from the presentence report,

2    particularly in paragraph 20, that talks about when the bulk

3    of the documents might have been taken out of the FBI, and

4    there's, you know, discreet dates on which some of these

5    things might have been removed from the FBI.

6        Of course, as we're thinking about just the optics

7    here, you know, 20,000 documents or whatever, I think it's

8    important to keep in mind that these are not all just boxes of

9    paper documents strewn about.  These are documents that are

10   contained on electronic media.  So, you know, 20,000 documents

11   could be a very small thing.  It's not, you know, quite so

12   scary perhaps as it initially sounds if you were to imagine

13   Bankers Boxes piled up someplace with just loose paper

14   classified documents.

15       I mean, there were paper documents obviously, but it

16   wasn't all in that vein.  So, of course, we're asking the

17   court to consider a sentence of probation here, and that's

18   what this -- that's what all of my talking is about.  And we

19   feel like that's the right result for a number of reasons.

20       Of course, we can't look away from the circumstances

21   of the offense.  Mr. Edwards mentioned that he wasn't going to

22   talk about the contents of the documents, and I'm not going to

23   talk about the contents of the documents either because I

24   probably will say something stupid and they'll get mad at me.

25   But, you know, I can't walk away from the seriousness of the

                                57

1  situation.

2           THE COURT:  Let me ask you a question about that

3  then because to highlight while the PSI in every case is

4  sealed, I don't think I'm revealing any information that is

5  inappropriate to note that it appears that these documents

6  were taken from as early as 2010 to potentially as late as

7  2015 as referenced in paragraph 20 that you took me to.

8           But your client pled guilty to two charges of

9  willful retention of national defense information, and a theme

10 of Mr. Edwards' argument is that we'll not know why.  And I'm

11 not going to try to violate your client's constitutional

12 rights by asking her.  So all I can do is ask you why did she

13 download all of these documents and store some of the paper

14 documents in her bathtub?

15          MR. ERMINE:  Our position is that Ms. Kingsbury was

16 extremely dedicated to the work that she was doing at the FBI.

17 She had over the years throughout her tenure at the FBI

18 experienced adversities in the workplace.  She was -- as the

19 court's considering her physical health that I've outlined in

20 the sentencing memo, that's kind of the backdrop for what I'm

21 about to discuss.

22          So throughout the time that she's experiencing these

23 rather serious physical health problems, she also was

24 experiencing difficulties in keeping up with her work with the

25 FBI.  Not only that, she was being bounced around from section

                              58

1    to section within the FBI.  She -- I think the court is aware,

2    you know, worked for these different -- we talked about these

3    different sections, the criminal section, et cetera.  And so

4    she was bounced around from different section to section.  But

5    -- and she was taking leave for her physical health problems.

6           And so she is experiencing the stress related from

7    trying to keep up with her work.  So I guess I hate to kind of

8    say it as simply as she's at fault for kind of taking her work

9    home with her despite the fact that she is told over the

10   course of years and throughout training that she's not

11   supposed to do that, but I think that that's a large part of

12   why we're here.

13          Her difficulties with the FBI are documented to some

14   degree.  She did file an EEOC complaint at some point with the

15   FBI, and so she had that kind of litigation, if you will,

16   going on throughout part of her tenure with the FBI as well.

17          But throughout it all, I think she would

18   characterize herself as being a dedicated employee of the FBI,

19   somebody who was resolved to help to forward the mission of

20   solving cases and doing what the agents asked her to do

21   despite the fact that she may have from time to time seen

22   different avenues to explore in terms of the way the cases

23   developed.  There may have been disagreements with agents

24   about how best to proceed on some of these cases.

25          But, I guess, that's as direct an answer I can give

                                    59

to the court. I think that is what she has essentially told the agents from the time that she was initially interviewed, and she's been consistent on that.

So to the extent the government is essentially saying as they -- I mean, they flatout say it in their sentencing memo. We indicted her, and then we asked her to give us a story that we would believe and she refused to do so; therefore, we're asking for a sentence of 57 months. I guess that is an accurate summation of the situation. They did try to get her to tell them a story that they found to be more credible, but she does not have a story that they find to be more credible.

She has the truth that she has been pretty consistent with throughout the pendency of the case. So when we talk about night-and-day differences, of course, these two positions on why this happened are worlds apart.

It doesn't change the reality that she was not supposed to have these classified documents outside. That's not what I'm suggesting. What I'm suggesting, though, is that many of these documents or some of these documents were related to her work. These are documents that she would have had a purpose to have in the first place, which we can't go into all of the details of that. But I'll leave that there. I'm not trying to suggest that that might be the case for all of them, but for many of them, that would be the case.

60

So, you know, that's really the basis for our

request is to ask you, the judge, to sentence her with that

background in mind, and from our perspective with that

background in mind, a sentence of probation makes all the

sense in the world.

She's, I mean, absolutely unlikely to ever appear

before any court again.  This disclosure happened five and a

half years ago in December of 2017.  She's been on pretrial

release now for over a year.  This case has been fairly slow

in developing, which makes sense given the nature of it, but

she's been cooperative in her own right throughout the

entirety of this.

So I understand the -- I mean, I understand the

government's position of wanting to say this is a serious case

and, therefore, she needs to gets a prison sentence.  I

understand that.  I just disagree with it.

This is not a case that justifies a prison sentence.

This is a case that has been slow in coming, but here she is.

She's accepted responsibility for her actions.  She's given

all the interviews and given all the access.  She's not been

an obstructionist.  She resolved this case short of a trial

after we did our due diligence.  We pled to the court, and

we're asking the court for really to take into account all of

her background, health concerns throughout this time, her

family concerns then and now, particularly her mother and her

                                     61

children.

And we, again, just think that probation is the right result in this case when you balance the nature of the case against her individual characteristics.  We think that, again, there's no risk of recidivism here.  There's no really even potential of recidivating in the same way.

We think that, you know, of course, one of the factors the court is supposed to consider is what message might possibly be sent to other people charged with similar crimes.  I don't know how much stock the court puts in that idea.  I imagine that every case along these lines is going to be extremely specific.  We have introduced to the court the specific background that we think is important to contextualize this, and we think that that background supports our request in this particular case.

So really examining all of the sentencing factors we think point to a sentence of probation.

Thank you, Judge.

THE COURT:  Thank you, Mr. Ermine.

Ms. Kingsbury, ma'am, is there anything you'd like to tell the court?

THE DEFENDANT:  Yes, sir.

THE COURT:  Ma'am, we might have Mr. Ermine just pull that microphone for you over there.  You can just stay seated right there, ma'am.  He'll just pull it down for you.

THE DEFENDANT:  I come before you as a woman with
her head held up and her eyes forward and integrity intact who
tried to survive in an unsuccessful work environment where I
paid the ultimate sacrifice of my health and my marriage.

            I went into this profession to help others and to
make a difference in the world.  I was not prepared for how
unhealthy it made me.  The high expectations and the pressure
of protecting others, yet no one was protecting me.  I am
loyal, respected, and determined whose passion was compromised
by failed leadership, constant shift of priorities,
assignments, and reprehensible culture to include looking out
for their own, promotions, transfers, or just being part of
the favorites.

            The start, stop of letting cases go inactive was not
allowed.  I was not allowed to complete to the best of my
abilities by solving, letting agents down who had expectations
of always wanting answers and solutions to their cases.

            The work box that has brought me before you was the
accumulation of that various work I will get back to.
However, I was working in a system that was never going to
allow me to succeed.  I carried that burden.

            The people deserved more from the desks inside the
walls of the government.  Systems failing is one thing, but
people failing people is the utmost destruction of humanity.

            I sought help through EEO mediation processes.  I

filed a whistleblower protection, yet they threw a full-court

press on me and my family.

I was a force in the analytic world. I never knew

how to give up until it was solved. I have solved and been

part of solving crimes no human being should ever have to

witness or know from crimes against children, violent nature

crimes to counterintelligence.

My heart and passion has always been protecting

those who couldn't protect themselves. I have continued to

protect and believe in the institution and community even when

they have branded me a traitor and vilified my character.

I self-disclosed to them what I discovered in my

basement storage during the most traumatic time in my family's

life. I am guilty of being too honest with no safety net. I

tell my story with dignity because I know it's bigger than me.

I am the best version of me.

Thank you.

THE COURT: Ma'am, pursuant to 18 U.S.C. 3553, this

court is required to impose a sentence that is sufficient but

not greater than necessary to comply with the provisions of

this statute.

Ma'am, I've considered the advisory guidelines,

which are 46 to 57 months. I've also considered the 3553

factors, and the first of which is the nature and

circumstances of the offense.

64

1          Ma'am, what you're guilty of is what you pled guilty

2    to, and that's two different counts of willful retention of

3    national defense information, two class C felonies.  We're all

4    under a lot of restrictions given the secret nature of these

5    documents, but I guess I'll be the one to talk a little bit

6    about them.  I reviewed them because, quite honestly, I was

7    worried that maybe somebody got a little happy with the secret

8    stamp and stamped everything under the sun.

9          And so I was -- as a guy who doesn't deal in secret

10   documents with the government until this case, I was, one,

11   glad that I was American; and, two, I was glad the FBI is on

12   the ball; and, three, reminded of the difficult nature of what

13   they do; and, four, knew all those documents that I reviewed

14   should be marked with various levels of classification.

15         So they weren't something that, you know, it was a

16   copy of "The Kansas City Star."  It wasn't just some amorphous

17   email.  It was all information that is designed to protect our

18   country from terrorism.  So my review made me appreciate what

19   the FBI does, made me appreciate the FBI analyst job and

20   putting that information together, and to know that these

21   documents were properly marked.

22         The only thing apparently we can agree on besides,

23   one, that you're guilty and you pled guilty; and, two, that we

24   just have a night-and-day difference on where it's at.  Ma'am,

25   you're clearly upset with the FBI.  As we sit here and as I

                                    65

1  watch you read that statement, as I watch you look over at the

2  FBI agent, you felt you have gotten a raw deal from them from

3  day one.

4         We cannot agree on the most simplest of things about

5  was this your home phone number, was this your private

6  cellphone number.  So for the Eighth Circuit or anybody else

7  that wants to know, I find it was your home phone number.  I

8  find that it is your cellphone.  And so that makes me at this

9  spot I've got to figure out and left to call into question,

10 whether we call it speculation or a trail of breadcrumbs, why

11 the heck an FBI analyst, one we know who's taking home

12 documents that they shouldn't for whatever reason would have

13 phone calls from the home phone number and personal cellphone

14 number from 2007 till 2018 to subjects of counterterrorism

15 investigation when that was never your job responsibility.

16        So I cannot fathom why you would do this.  I cannot

17 fathom why you would jeopardize our nation by leaving these

18 type of documents in your bathtub.  That is what I think the

19 nature and circumstances of the offense are.

20        The second factor that I'm supposed to consider is

21 history and characteristics of the defendant, and as argued in

22 your sentencing memorandum, you were going through hell during

23 a period of this time; that your father passed away in 2016,

24 your stepfather passed away in 2011; that you had a host of

25 physical health issues; and that in 2017, you were diagnosed

66

with depression and anxiety and went to counseling for at
least a year.

So when I hear you and your lawyer talking about the
stress and anxiety in your life that goes along with this job
and your personal health and your family situation, I don't in
any way deny that occurs, and there's no doubt that you were
struggling personally at that time, yet I'm still faced with
this situation that you've pled guilty to taking home
documents that shouldn't ever be outside the FBI.

The other factors that we've talked about, and I'll
address Mr. Ermine's argument about deterrence. If we were
any good at deterrence, we'd all be out of jobs, and I'd be
praising the Lord on that one. So I don't think we're
deterring anybody. And of any of the remaining factors, I
don't think we're going to ever deter you. I don't think
you're ever going to be in possession of a secret document
ever again, and as long as we're -- I'll go back briefly on
your history and characteristics.

I have read those letters, and here's what I take
away from it, you're a really good person at your job. The
people at the Harley Davidson place really like you. The
folks at the Ford County museum where you volunteer really
like you. You've got family here supporting you here today.
The people at the Dodge City Community College think that
you're a really good person.

67

You've got lots of people that see a lot of value in

2   you, and that also tells me you should have just quit the FBI.

3   If you were under that level of stress, you should have quit

4   and walked away and never taken any of these secret documents.

5          Some of those final remaining factors under 3553 are

6   promoting respect for the law and providing a just punishment,

7   and those can go both ways.  You've done fine on pretrial

8   release.  You've done everything we've asked.  You're never

9   going to be within 100 yards of a secret document again, and

10  so we don't have any thought that you're ever going to do this

11  again.

12         But I've also got to come up with something that

13  takes into account that you have pled guilty to this crime and

14  that I have found that these phone calls did take place from

15  your home and your personal cellphone number.  And, as

16  Mr. Edwards said, we will never, ever, ever know what took

17  place on those phone calls, and that's because you deny that

18  that's your home phone number and you deny those calls took

19  place.

20         So it's the judgment of this court that the

21  defendant is sentenced to the Bureau of Prisons for 46 months.

22  I find that you do not have the means to pay a fine and waive

23  any fine as required by law.  Three years of supervised

24  release.  The 46 months will be on Counts 1 and 2 to be run

25  concurrently.  The three years of supervised release will be

                                68

on Counts 1 and 2 to be run concurrently. $200 special
assessment.

While on supervised release, you shall comply with
all standard conditions of supervised release that have been
adopted by this court and the special and mandatory conditions
of supervision as set forth in part D of the presentence
report.

To the extent that you've not waived your right to
appeal this judgment and sentence pursuant to the plea
agreement you've entered in this case, you have 14 days from
the entry of judgment in your case to file a notice of appeal.
If you do not file a notice of appeal within 14 days of the
date of judgment, you will forever lose your right to appeal.
If you cannot afford to file an appeal, you can file a motion
to proceed in forma pauperis. If you so request, the clerk of
the court shall immediately prepare, file a notice of appeal
on your behalf.

I'd like to hear argument from the parties on a
self-report or immediately go into custody.

MR. EDWARDS: Judge, I'm going to defer to the court
on that issue. If the court would like her taken into custody
today, then obviously the government is fine with that, but I
will defer to the court.

THE COURT: Mr. Ermine, my inclination is to get a
relatively short time for her to get her affairs in order and
69

1    turn herself in and that we place her on location monitoring

2    during that entire time.

3            Do you have any opposition to that?

4            MR. ERMINE:  No strong opposition, Judge.

5            As you mentioned, she's done perfectly sterling

6    while on pretrial release.  I understand the court's concern

7    and the consideration of location monitoring.  So I guess for

8    purposes of posterity, we would suggest that that condition

9    wouldn't be necessarily -- necessary under those

10   circumstances, but, otherwise, that sounds fine, Judge.

11           THE COURT:  About two weeks, is that okay with

12   probation?

13           THE PROBATION OFFICER:  Judge, the marshals

14   generally would ask for 30 days --

15           THE COURT:  About 30 days.

16           THE PROBATION OFFICER:  -- for assignment to the

17   Bureau of Prisons.

18           THE COURT:  Tracey?

19           THE COURTROOM DEPUTY:  Friday, July 21st.

20           THE COURT:  Friday, July 21st.

21           Ms. Kingsbury, ma'am, please stay in very close

22   contact with your probation officer, as you've done before.

23   I'm not suggesting that you won't, but I'm just encouraging

24   you not to give them any reason to contact me.  And that means

25   you need to stay in enormously close contact with them, work

                                    70

Case 4:21-cr-00101-SRB   Document 48   Filed 07/19/23   Page 70 of 72

1   closely with them before you leave here today.

2            Is it possible to get location monitoring on?  Do

3   you think that's possible?

4            THE PROBATION OFFICER:  Given that she's outside of

5   the district in Dodge City, Kansas, I believe that's still her

6   residence, that would have to be coordinated with their

7   office.

8            THE COURT:  So we're not going to get it today.  So

9   you need to work with them and try to figure out how to make

10  that happen as soon as possible, and that means working with

11  my probation office so that I'm not in any way having to get

12  trigger happy.

13           THE PROBATION OFFICER:  And if I can clarify with

14  just specifics with location monitoring as to what type?

15           THE COURT:  I just want to be able to know where she

16  is all the time.

17           THE PROBATION OFFICER:  Okay, okay.  So just we can

18  specify it on the specific equipment, but just a schedule

19  basically?

20           THE COURT:  I want something on her ankle that I

21  know where she's at.  I don't care about the curfew unless

22  you've got her on a curfew.

23           THE PROBATION OFFICER:  Okay.

24           THE COURT:  So all those same conditions that you're

25  currently under, you're going to be continued under.  But I'm

                                    71

1  not suggesting we need to lock her down in her residence.  I'm

2  just -- I want to know where she is 24/7.

3         THE PROBATION OFFICER:  Got you.  So no home

4  detention or anything?

5         THE COURT:  No home detention.

6         Anything additional from the United States

7  government?

8         MR. EDWARDS:  No, Your Honor.

9         THE COURT:  Anything additional from the defense?

10        MR. ERMINE:  Judge, to the extent that the Eighth

11 Circuit would like me to reassert my objection to the court's

12 factual finding regarding the nature of the phone calls,

13 specifically I would reassert that objection for purposes of

14 the record and I guess further assert that we believe the

15 appropriate sentence would have been probation in this case.

16        THE COURT:  Thank you, Mr. Ermine.

17        MR. ERMINE:  Thank you, Judge.

18        THE COURT:  We'll be in recess.

19            REPORTER'S CERTIFICATE

20        I certify that the foregoing pages are a correct

21 transcript from the record of proceedings in the

22 above-entitled matter.

23 _____    _____
        Date              /s/Gayle M. Wambolt
24                     GAYLE M. WAMBOLT, CRR, RMR
                       United States Court Reporter
25                            72

Case 4:21-cr-00101-SRB   Document 48   Filed 07/19/23   Page 72 of 72